IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. AP-75,526






EX PARTE EVANGELICA AGUILAR, Applicant








ON APPLICATION FOR A WRIT OF HABEAS CORPUS


FROM NUECES COUNTY







Holcomb, J., delivered the opinion for the Court, in which Meyers, Price, Womack,
Johnson, and Cochran, JJ., joined. Keller, P.J., Keasler, Hervey, JJ., dissented without
opinion.



O P I N I O N


 In this case, we must determine whether applicant was denied her Sixth Amendment right to the
effective assistance of counsel at the guilt stage. We filed and set this case to clarify the manner in which
we assess counsel's errors in determining prejudice under Strickland v. Washington, 466. U.S. 668
(1984). We hold, as we have indicated in the past, that such errors should be considered cumulatively.

Background

 On October 17, 1997, applicant Evangelica Aguilar and her stepmother, Nilda Aguilar, were jointly
indicted in Nueces County for the murder of Juan Aguilar, applicant's father and Nilda's husband. Both
defendants filed pre-trial motions, which they urged throughout the trial, for a severance of their cases,
claiming that the defense of each was prejudicial to that of the other. The trial court denied the motions. 
The two defendants were tried together, although the jury was to consider the guilt of each separately from
that of the other. The evidence at trial adduced the following facts pertinent to the issues before us.

 On the night of March 10 or in the early morning hours of March 11, 1995, Juan Aguilar was shot
to death with a high-velocity rifle while he was apparently asleep in his bed. He was a Corpus Christi
police officer, who had two children from his first marriage: a son, Gabriel, and a daughter, applicant. That
first marriage had ended in divorce, whereupon the children moved back and forth between their parents
until Juan married Nilda in 1981. Applicant moved away when she turned sixteen, but Gabriel continued
to live with Juan and Nilda until he joined the United States Navy in 1993 and had to be away from home
for long periods of time. Thus, Juan and Nilda were living by themselves when Juan was shot to death.

 The testimony at trial showed that Juan was last seen alive by an independent witness on the
afternoon of March 10 between 4:30 and 5:00 p.m. Thus, the two defendants were the only witnesses to
what happened from then until Juan's body was found at approximately 10:00 a.m. the following morning. 
Nilda's and applicant's statements, made on March 11, essentially corroborated each other, stating that:
(1) applicant had called in the afternoon of March 10 to speak to Nilda, but Juan had answered the
telephone; (2) Juan and applicant then had an argument about some money that Nilda had lent applicant;
(3) Juan told applicant not to call or come to his house anymore; (4) Nilda came on the line, and Juan told
her to hang up, which she did; (5) applicant then drove over to Juan and Nilda's house; (6) Nilda did not
let her in, saying that Juan had told her not to do so; (7) Nilda told applicant to meet her shortly thereafter
at a nearby H.E.B. grocery store, where they met a few minutes later and talked briefly; (8) applicant asked
Nilda to meet her later at the Sunrise Mall; (9) the two agreed to meet, and did meet, each other there at
8:00 p.m. that evening; (10) the two women stayed at the mall, talking, until the mall closed; (11) they then
went to Cole Park, where they talked some more; (12) the two then returned to applicant's house, where
Nilda spent the night; (13) Nilda went back to her home some time between 9:00 and 9:30 a.m. the
following morning; and (14) she found Juan's body in their bedroom. (1)

 On May 12, 1995, Nilda was charged with Juan's murder. On October 3, 1995, while Nilda was
awaiting trial, applicant gave a second statement that: (1) Nilda had a rifle when she met applicant on
March 10, 1995, the night of the murder; (2) she told applicant that she had to get that rifle out of the house
to keep Juan from hurting himself; (3) she asked applicant to follow her as they left Cole Park in their
separate cars; (4) she drove for a long time until they arrived at a bridge; and (5) she brought the rifle out
of the backseat of her car and threw it off the bridge and into the water below. Applicant took the police
to that bridge, where they recovered a rifle that appeared to be the suspected murder weapon. (2) The
record indicates that the focus of the police investigation was exclusively on Nilda until applicant took the
police to the site of the suspected murder weapon. Thereafter, on October 17, 1996, both applicant and
Nilda were jointly charged with Juan's murder.

 Their trial began on June 4, 1997, and jury deliberations began on June 11. On June 12, the jury
sent the trial court a note indicating that it had reached a unanimous verdict on Nilda but that it was
deadlocked on applicant. The trial court gave the jury an Allen (3) charge and sent it back to continue its
deliberations. A few hours later, the jury reached a unanimous verdict on applicant, finding her, too, guilty
of murder. The punishment phase of the trial began on June 16. On June 17, the jury began its
deliberations and reached a verdict on Nilda the same day but again needed more time to deliberate on
applicant's case. After a discussion with the parties, the trial court decided to receive the verdict on Nilda. 
The following day, the jury reached a verdict on applicant. In each case, it assessed punishment at
imprisonment for 25 years.

 The court of appeals affirmed applicant's conviction. (4) On December 12, 2005, applicant filed the
present application for habeas corpus relief, alleging ineffective assistance of counsel at the guilt-innocence
stage because her trial counsel: (1) opened the door to evidence of applicant's prior extraneous
misconduct; (2) elicited testimony on applicant's prior use of cocaine; (3) failed to object to the
prosecutor's eliciting testimony that applicant had killed one of her stepmother's rabbits; (4) failed to object
to testimony that applicant, during her youth, was dishonest and lied when it benefitted her; (5) failed to
object to the improper argument of Nilda's counsel that he did not cross-examine applicant because "it was
so obvious that she was a liar"; and (6) failed to request limiting instructions to the evidence of applicant's
alleged extraneous acts of misconduct. We remanded the case to the trial court for a live evidentiary
hearing. (5) On May 31, 2006, the habeas court conducted an evidentiary hearing and recommended that
relief be denied.

The Standard for Review

 We find the test for reviewing claims of ineffective assistance of counsel in Strickland v.
Washington, 466 U.S. 668 (1984). As we have previously noted, Strickland does not provide a
"mechanistic formula" for such review. Ex Parte Welborn, 785 S.W.2d 391, 393 (Tex. Crim. App.
1990). Rather, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's
conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on
as having produced a just result." Id. (quoting Strickland, 466 U.S. at 686).

 Scrutiny of counsel's performance must be "highly deferential." Strickland, 466 U.S. at 689. "A
fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects
of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct
from counsel's perspective at the time." Id. Thus, we "must indulge a strong presumption that counsel's
conduct falls within the wide range of reasonable professional assistance." Id. But the defendant can rebut
the presumption by showing that (1) "counsel's performance was deficient" and (2) "the deficient
performance prejudiced the defense." Id. at 687.

 The Strickland Court did not give any specific guidelines for determining deficient performance. 
The Court simply advised that counsel is expected to provide "reasonably effective assistance," id., and
that such "reasonableness" should be measured under "prevailing professional norms," id. at 688. 
Essentially, counsel is obliged to fulfill "certain basic duties," including "a duty to bear such skill and
knowledge as will render the trial a reliable adversarial testing process." Id.

 If deficient performance is found, Strickland provides greater guidance for determining whether
such deficiency prejudiced the defense. Noting that "the appropriate test for prejudice finds its roots in
the test for materiality of exculpatory information not disclosed to the defense by the prosecution and in the
test for materiality of testimony made unavailable to the defense by Government deportation of a witness,"
Strickland requires the defendant to "show that there is a reasonable probability that, but for counsel's
unprofessional errors, the result of the proceeding would have been different," and defines "[a] reasonable
probability [as] a probability sufficient to undermine confidence in the outcome." Id. at 694.

 Applicant argues that the habeas court erred in concluding that she failed to show prejudice
because it considered each allegation of counsel's deficient performance separately. Applicant contends
that Strickland requires counsel's errors to be considered cumulatively. We agree and have indicated as
much in the past. For example, in Ex Parte Welborn, supra, we stated that "[a]n applicant must show
omissions or other mistakes made by counsel that amount to professional errors of a magnitude sufficient
to raise a reasonable probability that the outcome of the trial would have been different but for the errors." 
785 S.W.2d at 393 (emphasis added). Indeed, our disposition of that case was grounded on this premise
when we held that "[a]lthough, no one instance in the present case standing alone is sufficient proof of
ineffective assistance of counsel, counsel's performance taken as a whole does compel such a holding." 
Id. at 396.

 The language in Strickland supports our position. The Strickland Court's discussion was divided
between the two prongs of the test: deficient performance and prejudice. In discussing the first, the Court
largely used collective nouns, such as "performance" or "conduct," thus not clearly indicating whether it was
advising courts to focus on errors individually or cumulatively. (6) Its discussion of the prejudice prong,
however, is replete with the use of the plural tense, referring to counsel's alleged "errors" and thus indicating
a cumulative, not individual, consideration of such errors. See id. at 693-96. (7)

 The State in this case agrees with applicant that counsel's errors should be considered cumulatively
for purposes of determining counsel's effectiveness. (8) Its only contention is that counsel's alleged errors
should not be considered either in determining deficient performance or prejudice because counsel followed
a reasonable trial strategy.

Deficient Performance

 We note that "a verdict or conclusion only weakly supported by the record is more likely to have
been affected by errors than one with overwhelming record support." Strickland, 466 U.S. at 696. The
State admitted to the jury that its case against both applicant and Nilda was based purely on circumstantial
evidence. Indeed, there was no physical evidence such as fingerprints, blood, etc., (9) to connect either
defendant to the crime. Rather, the State focused on the possible motive each defendant might have had
to kill the victim. The State presented ample evidence showing Nilda's strained relationship with Juan and
how much she stood to gain from his death, (10) but it produced only the following three pieces of evidence
against applicant.

 First, the State tried to show that applicant also had a strained relationship with Juan by presenting
the testimony of two off-duty police officers working as a club's security officers about a remark that
applicant made to them almost six months before Juan's death. According to this testimony: (1) the incident
took place in September 1994; (2) the officers were called in to remove applicant from the premises,
because she was creating "a small disturbance" (showing off some karate moves to her friends inside); (3)
she was "intoxicated" but "not drunk" and could therefore not be arrested; (4) after they brought her out
of the club, she used a pay-phone to call someone; (5) she then told them that "she hated cops and that she
hated [Juan]" and that "she wished he was dead"; and (6) she left the premises. On cross-examination,
the officers admitted that (1) they never filed a report about the incident; (2) they did not mention the
incident to their lieutenant until "several days" after Juan's death; (3) it was not until January 16, 1996
(about three months after applicant took the police to the rifle, ten months after Juan's death and some
sixteen months after the incident itself) that they gave a statement about the incident; and (4) they could not
explain why their lieutenant "waited so long" to take a statement from them.

 Second, the State tried to show applicant's possession of the suspected murder weapon by offering
testimony that she had tried to sell a witness a high-powered rifle some time before Juan's death. However,
this witness could not remember when this offer to sell a rifle occurred or anything about the weapon except
that "it was a high-powered rifle." Thus, the State could not show either that the rifle applicant tried to sell
was, in fact, the murder weapon or that it was still in her possession when Juan was killed.

 Third, the State offered evidence that applicant had taken the police to the suspected murder
weapon. Since the first two pieces of evidence (applicant's remark at the club and her attempt to sell a
high-powered rifle) were only remotely connected in time to the murder, this third piece of evidence was
the most critical that the State presented against her, and it is primarily in light of this evidence that we
consider the following allegations of error to determine whether "there is a reasonable probability that, but
for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland,
466 U.S. at 694.

1. Counsel opened the door to evidence of applicant's prior extraneous misconduct.

 Counsel for applicant (11) and counsel for Nilda filed pre-trial motions in limine, asking the trial judge
not to allow any party to mention their respective client's extraneous acts of misconduct, or other collateral
matters, until he had ruled on the admissibility of such evidence outside the presence of the jury. The trial
judge granted the motions. Thus, the jury had heard no evidence of applicant's extraneous acts of
misconduct until co-counsel, during the State's case, asked applicant's brother, Gabriel, whether he
gathered from family discussions that Juan was "not always proud of what [applicant] was doing." Nilda's
counsel, on cross-examination, then asked Gabriel to tell the jury about "the kind of things" that applicant
did which caused Juan to be not proud of her. Gabriel responded that she talked back to him and cursed
in front of him and his friends. Nilda's counsel repeated Gabriel's answer, and asked him, "What else?" 
At that point, co-counsel asked to approach the bench and, outside the presence of the jury, objected that
Nilda's counsel was going into extraneous misconduct and reminded the trial judge that this was "exactly
what" he had told the parties not to do. The trial judge overruled the objection, stating that co-counsel had
opened the door to such evidence.

 The trial judge, however, told Nilda's counsel to continue his cross-examination outside the
presence of the jury to ensure the admissibility of the rest of the testimony. Nilda's counsel then elicited
several instances of applicant's extraneous acts of misconduct. But when he asked Gabriel about
applicant's use of drugs, Gabriel replied that he did not know anything about that. Nilda's counsel then
promised the trial judge that he would not ask Gabriel about that in front of the jury. The trial judge allowed
the rest of the testimony.

 When the jury was brought back, Nilda's counsel had Gabriel repeat that applicant talked back
in front of Juan's friends. He also elicited the following facts: (1) applicant had different children from
different fathers; (2) she had more than one child without being married to the man in question; (3) she
worked as a topless dancer; and (4) she associated with people of whom Juan did not approve. Co-counsel did not object. Later, Nilda's counsel, in cross-examining the State's witness who testified that
applicant had tried to sell him a high-powered rifle, elicited from him also that applicant worked at a topless
bar at the time of the attempted sale. Counsel for applicant did not object this time either.

 It is impermissible to try a defendant as a person of bad character or a criminal generally. Templin
v. State, 711 S.W.2d 30, 32 (Tex. Crim. App. 1986). See also Tex. R. Evid. 404(a) ("Evidence of a
person's character or character trait is not admissible for the purpose of proving action in conformity
therewith on a particular occasion."). Moreover, evidence of a criminal defendant's character is not
admissible unless it is offered by the defendant himself or by the prosecution to rebut the same. Tex. R.
Evid. 404(a)(1)(A). Since applicant had not yet testified, she had not made her character relevant when
Gabriel testified for the State. Morever, even after she testified, only the prosecution - not the co-defendant's counsel - was entitled to attack her character to impeach her credibility. Id. Even then,
however, Texas Rule of Evidence 608(b) prohibits the use of specific instances of misconduct, for which
no criminal conviction has been had, for the purpose of attacking a witness's credibility. Thus, testimony
that applicant was rude and cursed, had children out of wedlock by different men, worked as a topless
dancer, and associated with unsavory persons, would have been inadmissible, over timely objection, even
if the prosecution had tried to introduce such evidence. In fact, it was precisely because of the irrelevant
and prejudicial nature of such testimony that the trial court had prohibited the introduction of such
evidence (12) until co-counsel opened the door to his own client's extraneous acts of misconduct.

 Co-counsel stated, in his affidavit (13) and at the evidentiary hearing, that he did not think that he had
opened the door to applicant's extraneous offenses, when he asked Gabriel about why Juan was not
always proud of his daughter. But counsel should have pursued his objection to preserve error for the
appellate courts to determine whether he had opened the door to such evidence. Neither lead counsel nor
co-counsel did so, either when Nilda's counsel resumed his cross-examination of Gabriel after the trial
judge's ruling, or when he asked the other witness about applicant's working at the bar when she had
allegedly tried to sell the rifle to him.

 Co-counsel also asserted, in his affidavit and at the evidentiary hearing, that evidence pertaining to
applicant's extraneous acts of misconduct would certainly have come in after she had testified. He admitted
at the evidentiary hearing, however, that a defendant cannot generally be impeached with specific instances
of immoral conduct under Texas Rule of Evidence 608(b). Nevertheless, he expected such evidence to
be admitted after applicant testified, because he thought that it was relevant to her relationship with her
father. When habeas counsel pointed out that he had opened the door to the very evidence that lead
counsel had tried to exclude through the motion in limine, co-counsel stated that (1) both he and lead
counsel had expected such evidence to come in, despite the fact that the motion had been granted; (2) lead
counsel had filed the motion merely to control when and how this evidence came in; and (3) co-counsel's
question to Gabriel (about why Juan was not proud of his daughter) was in fact designed to elicit some of
this extraneous evidence, as a means of controlling the introduction of such evidence.

 There was no evidence at trial to show that applicant's allegedly talking back to her father, cursing,
having children out of wedlock by different men, working as a topless dancer, and associating with persons
Juan disapproved of, had anything to do with his murder. The fact that applicant's father "was not always
proud" of what applicant was doing is not an "Open Sesame" to any and all of applicant's behavior of
which her father might have disapproved. The State did not argue that applicant might have killed her father
because he was not proud of her. Rather, it clearly stated that its theory was that Nilda had persuaded
applicant, upon whom she exerted a great deal of influence, to kill Juan for her. (14)

 In short, the record does not support co-counsel's explanations. Neither the State nor Nilda's
counsel had argued or presented any evidence of applicant's extraneous acts of misconduct until co-counsel opened the door to such evidence. Even afterwards, only Nilda's counsel took advantage of the
opening although, up to that point, he had been precluded from doing so both by the trial court and the
Texas Rules of Evidence. (15) In light of all this, we hold that co-counsel's performance in purportedly
opening the door and failing to object to this improper testimony fell below the objective standard of
reasonableness required by Strickland and was therefore deficient.

2. Counsel elicited testimony on applicant's prior use of cocaine.

 No evidence about applicant's drug use had been presented when she took the stand. Lead
counsel brought it to the jury's attention, for the first time, when he elicited from applicant that she used to
have a drug problem and had used cocaine daily until December 1994.

 The general rule is that an accused should be tried for the offense for which he is charged and not
for some collateral crime or for being a criminal generally. See, e.g., Couret v. State, 792 S.W.2d 106,
107 (Tex. Crim. App. 1990). Extraneous matters are admissible only if they meet the extraneous-offense
test: that the evidence be relevant to a material issue in the case and that the probative value of the evidence
is not substantially outweighed by the prejudicial potential. Id. In Couret, for example, we reversed the
judgment of the court of appeals because there was "no suggestion or indication that appellant burglarized
the warehouse to obtain money or property to support a drug habit." Id. at 108. Similarly, there was no
evidence in the present case to indicate that applicant's conduct relating to her father's murder was
somehow related to her drug habit.

 In his affidavit, lead counsel admitted that he elicited evidence of applicant's cocaine use "because
[he] felt confident the State and [Nilda's counsel] would go into this area," but he did not give a reason for
such confidence. He stated at the evidentiary hearing that the State could have tried to introduce evidence
of prior drug use in a non-drug offense under the following theory:

 I think the motive was to show that because of her drug habit there was some funds that,
I think, her dad was holding for her and, you know, that would be one of the reasons why
she was angry and upset with him was because he would not let her have the funds.


 Co-counsel had also stated, in his affidavit and at the evidentiary hearing, that evidence of
applicant's prior drug use would have come in because "the State's theory was that applicant had killed
her father over a dispute over" the funds that Juan had been holding for her, allegedly to prevent her from
spending it all on her drug habit. Co-counsel admitted at the evidentiary hearing, however, that the State
never offered "any evidence in their case in chief that [applicant] used drugs or that drugs were the motive
for the murder" and that "[t]here was nothing about drugs in the State's case." In fact, he agreed that they
"had gotten to the end of the trial with the defendant testifying and there was no evidence in front of the jury
about her drug use or drugs being a motive for murder," until lead counsel brought up the subject of her
prior drug use. As noted earlier, the State had stated its theory for the record, and this theory had nothing
to do with applicant's prior drug abuse or other alleged extraneous offenses. (16)

 At the evidentiary hearing, lead counsel admitted that: (1) possession of cocaine constituted a felony
and a specific act of misconduct; (2) he was not familiar with any of the cases cited in habeas counsel's
brief regarding the admissibility of evidence of a defendant's drug use in a non-drug offense case; (3) he
did not research the issue of whether such evidence would have been admissible; (4) he himself had filed
a motion in limine asking the trial court to rule, outside the presence of the jury, on the admissibility of such
evidence before allowing it to be presented before the jury; (5) he would not have elicited this evidence if
the court had ruled that it was inadmissible; but (6) he did not ask the trial court to rule on the admissibility
of such evidence before introducing it himself before the jury. Similarly, co-counsel admitted that he "kind
of expected [evidence of applicant's prior drug use] was not admissible but [that he] did not have any cases
on it" because he did not research that issue.

 In short, the record shows that counsel were aware of the problems that might arise by the
extraneous evidence (as shown by the filing of their pre-trial motion), but that they failed to research the
law and were therefore inadequately prepared to address them. Thus, they inadvertently opened the door
to the very evidence that they had, up to that point, successfully kept out, allegedly in an effort to rebut a
State's theory that the State itself never advanced. We conclude that counsel failed in their "duty to bring
to bear such skill and knowledge as will render the trial a reliable adversarial testing process," Strickland,
466 U.S. at 688, and hold that lead counsel's introduction of evidence of applicant's prior drug use
constituted deficient performance.

3. Counsel failed to object to the prosecutor's eliciting testimony that applicant had killed one of
her stepmother's rabbits.

 As noted earlier, the most critical piece of evidence that the State presented against applicant was
that she led the police to the suspected murder weapon. According to her trial counsel, applicant took the
stand to respond to this evidence, testifying that: (1) she knew the location of the weapon because Nilda
had taken her there and had thrown the weapon away in front of her; (2) she was afraid to tell the police
about it earlier because Nilda had threatened to kill her, her unborn baby, and her grandmother, if she ever
told anyone about what happened at the bridge; and (3) she did not know about Juan's death at the time,
but she continued to obey Nilda's instructions to keep quiet even after she found out because that
knowledge made her more afraid.

 On cross-examination, the State challenged applicant's claimed fear of Nilda by asking her, without
objection, whether she killed one of Nilda's rabbits. Applicant denied doing so and the prosecutor
impeached her with her grand-jury testimony that a rabbit had died of a heart attack, which she had caused,
because Nilda "wouldn't cry over [her] father [Juan's death]." Nilda's counsel then used this testimony
in his closing argument to demonstrate that applicant was both dishonest and violent, suggesting that
applicant's killing the rabbit indicated her capability to kill her father as well.

 It is impermissible to try a defendant as a person of bad character. Templin, 711 S.W.2d at 32. 
See also Tex. R. Evid. 404(a). In Templin, appellant Bobby Templin was convicted of murdering his wife
by electrocution. The State presented witnesses who testified that when Templin was ten or twelve years
old, he told them that he electrocuted dogs and cats. The State "offered this evidence to 'identify'
[Templin] by establishing that killing by electrocution is a 'signature' of his modus operandi." Templin, 711
S.W.2d at 33. We applied the two-part test for admissibility of extraneous-offense evidence (17) and agreed
that the State satisfied the first prong of the test, because "a material issue in the State's case was the
identity of the criminal actor and the testimony aided in identifying [Templin] as the person who committed
the crime," id., since the extraneous evidence showed Templin's "unusual degree of comfort with electricity
and [his] apparent propensity to kill by electrocution." Id. Nevertheless, we held that the State failed to
satisfy the second prong of the test, because the probative value of the evidence was substantially
outweighed by its "prejudicial and inflammatory nature," partly due to the length of time separating the
extraneous offense from the one before us (some ten to fifteen years) and partly due to Templin's age
(between ten and twelve) at the time he allegedly committed the extraneous offense. Id. at 33-34.

 In the present case, the State failed to satisfy even the first prong of the test: to show the relevance
of the extraneous-misconduct evidence to a material issue in the case. The prosecutor had offered this
evidence to impeach applicant's credibility on her alleged fear of Nilda as being the reason that she had not
told the police earlier about the rifle. However, evidence that applicant killed Nilda's rabbit does not
indicate that she was not afraid of Nilda, especially since the prosecutor never challenged the rest of her
testimony: that the rabbit was already sick and that she had killed it, behind Nilda's back, by "causing" it
to have a heart attack. Under these circumstances, Nilda was likely to think that the rabbit had died
naturally because it was already sick. Thus, evidence that applicant might have killed one of Nilda's three
rabbits, in a fit of anger because Nilda would not cry over her father's death, is irrelevant because it fails
to show that applicant was unafraid of Nilda.

 Moreover, it is impermissible to attack a witness's credibility either by inquiring into specific
instances of misconduct on cross-examination or by trying to prove such instances of misconduct by
extrinsic evidence. Tex. R. Evid. 608(b). The prosecutor violated both these provisions of the rule
inasmuch as he first cross-examined applicant about a specific instance of misconduct (killing the rabbit)
and when she denied the misconduct, used extrinsic evidence (the grand-jury testimony) to prove it. 
Counsel should have objected to both these violations.

 The problem was compounded when Nilda's counsel used the improperly elicited testimony to
argue in his summation that applicant was violent. (18) However, evidence that applicant might have killed a
rabbit is irrelevant to whether she could kill a human being, especially her own father. Moreover, the rabbit
died after Juan's murder, and the two were killed in different ways: the rabbit had died of a heart attack
(allegedly caused by applicant), while Juan was killed by a high-powered rifle. In short, the killing of the
rabbit establishes neither a "propensity to kill" nor "identifies" appellant by establishing a certain method
of killing as a "signature" of her modus operandi, as the extraneous-offense evidence did in Templin. See
711 S.W.2d at 33.

 In his affidavit, lead counsel admitted that: (1) the testimony relating to the rabbit's death was
irrelevant to whether applicant murdered Juan; (2) the State did not give pre-trial notice regarding this
extraneous misconduct; (3) he could have objected based on relevance, prejudice, and lack of notice; but
(4) he did not object. At the evidentiary hearing, lead counsel agreed that: (1) the prosecutor's question
about whether applicant had killed Nilda's rabbit was improper because it was a question about a specific
act of misconduct and the issue of whether applicant had killed the rabbit was collateral to the issue of
whether she had killed Juan; (2) he should have objected to this testimony on the bases of relevance,
prejudice, lack of notice, and an attempt to impeach on a collateral matter; (3) it was harmful to applicant
for the jury to find out that she had previously killed a living creature and apparently lied about it on the
stand; and (4) the harm was compounded by Nilda's counsel's argument that she was violent and a liar.

 Co-counsel stated in his affidavit that neither he nor lead counsel "had any idea that Applicant had
allegedly killed one of her step-mother's rabbits." He admitted at the evidentiary hearing that: (1) he had
not read applicant's grand-jury testimony; (2) he was not even aware of the fact that "[i]n a pretrial hearing
the judge orders the State to disclose [the defendant's] grand-jury testimony"; and (3) he did not know
whether lead counsel, during discovery, had requested all the statements made by applicant.

 In his affidavit, co-counsel also admitted that applicant's allegedly killing the rabbit "[might] have
been extraneous conduct not relevant to this case," but that neither he nor lead counsel saw the evidence
as damaging to applicant's case at the time that it was presented to the jury. According to co-counsel's
affidavit, the evidence became relevant when the prosecutor used applicant's prior inconsistent grand-jury
testimony to impeach her, because it showed that she had "either lied or was just mistaken in her previous
answer" that she had not killed the rabbit. As we discussed earlier, however, the prosecutor's use of this
evidence constituted improper impeachment.

 At the evidentiary hearing, co-counsel agreed that the question whether applicant had killed one
of Nilda's rabbits was: (1) irrelevant to a charge of killing her father; (2) inadmissible under Templin and
Rule 608(b); (3) collateral to whether she killed her father; and that (4) the defense should have timely
objected to the prosecutor's initial question as to whether applicant had ever killed a rabbit; and (5) the
prosecutor's impeachment of applicant on a collateral matter, showing she had previously lied under oath,
was harmful to her in a case where her credibility had become an issue before the jury.

 In short, the record shows that counsel did not seek or read applicant's prior grand-jury testimony
about the rabbit's killing, that they were not prepared for the prosecutor's question, and that they failed to
realize the significance of this evidence at the time that it was improperly elicited. Thus, counsel failed in
their "duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing
process," Strickland , 466 U.S. at 688., and we hold that counsel's failure to object to the improper
evidence constituted deficient performance.

4. Counsel failed to object to testimony that applicant was dishonest and lied growing up when it
benefitted her.

 Nilda's counsel, during her defense, recalled applicant's brother, Gabriel, and elicited, without
objection, that applicant, during her youth, was "not always" honest and used to lie when it benefitted her. 
In fact, Nilda's counsel posed several leading questions on his direct examination, without objection, and
had Gabriel confirm specific instances where applicant had allegedly lied. Lead counsel, during his
summation, then endorsed Gabriel's testimony, stating: "You have -- then you have [applicant's] testimony. 
You know, her own brother says she may not be the most truthful person." (19) Nilda's counsel, in his own
summation, referred to this comment to persuade the jury not to believe applicant's testimony because her
own attorney admitted that she was a liar. (20)

 Since applicant testified, her credibility was subject to attack as that of any other witness. See Tex.
R. Evid. 608. However, it is improper to use specific instances of a witness's conduct for this purpose. 
See Tex. R. Evid. 608(b). Moreover, the record shows that Nilda's counsel was practically testifying
himself, by asking leading questions and having Gabriel answer "yes" or "no," which is also improper during
the direct examination of a witness. See Tex. R. Evid. 611(c). (21) Thus, Nilda's counsel's attempt to
introduce such evidence was improper, and the resulting testimony was inadmissible. Applicant's counsel
should have objected on both the above grounds.

 Lead counsel, in his affidavit, explained that he failed to object because he believed it to be "proper,
admissible character testimony." In fact, even at the evidentiary hearing, lead counsel declined to agree that
"a co-defendant may not attack the defendant's credibility in the manner that [Nilda's counsel] did here,"
stating that "I am not for certain about that." Co-counsel did agree, however, at the evidentiary hearing,
stating that a co-defendant "[c]an't present characterized [sic] evidence, yes, I'm aware of that."

 In his affidavit, co-counsel explained that he did not object because: "I believed [Gabriel's]
testimony actually showed his prejudice toward Applicant. Therefore, [his] testimony about Applicant's
alleged dishonesty, I felt, was just due to his prejudice against Applicant, and I felt the jury would see that
he was prejudiced, by listening to his testimony." He stated the same at the evidentiary hearing. However,
when habeas counsel pointed out that counsel never made this argument (how Gabriel's testimony actually
showed his prejudice toward applicant) to the jury, co-counsel responded, "I don't know whether [lead
counsel] addressed that or not."

 In short, the record indicates that counsel were unfamiliar with the applicable law, that they did not
research the issue and, therefore, did not realize the legal basis for an objection to Gabriel's testimony
concerning specific instances of conduct to show the allegedly "untruthful" character of the witness, i.e.,
applicant. Thus, counsel failed in their "duty to bring to bear such skill and knowledge as [would have
rendered] the trial a reliable adversarial testing process," Strickland, 466 U.S. at 688, and we hold that
such failure constituted deficient performance.

5. Counsel failed to object to the improper argument of the co-defendant's lawyer that he did not
cross-examine applicant because "it was so obvious that she was a liar."

 Nilda's counsel argued throughout his summation that the jury should not believe applicant's
testimony against his client because applicant was a liar. He emphasized that he did not even cross-examine her because he personally believed that she was a liar. (22)

 In Menefee v. State, 614 S.W.2d 167, 168 (Tex. Crim. App. 1981), we held that it was
reversible error for the prosecutor to inject his personal opinion of a witness's credibility into his jury
argument (23) when the credibility of the witness was critical to the trial. We explained that it was improper
because it was likely to "carry undue weight with the jury in light of the prosecutor's experience." Id. The
same is true in the present case, where the record shows that Nilda's counsel appeared frequently on
television, was a well-known criminal-defense attorney in the community, and was acknowledged both by
the fellow attorneys and the trial court as the most vigorous attorney at trial. (24) Thus, his expressed personal
belief about applicant's credibility, like the prosecutor's personal opinion of his witness's credibility in
Menefee, was likely to "carry undue weight with," id., and thus improperly influence, the jury in this case.

 In his affidavit, lead counsel admitted that he did not object to the above argument by Nilda's
counsel, but could not remember why and that, in retrospect, he thought that he might have viewed the
argument, at the time, to be a proper summary of the evidence. At the evidentiary hearing, he admitted that
he was not aware of the case law that a lawyer cannot argue his personal opinion of a witness's credibility,
that he did not research that issue, but that he still felt "reasonably comfortable" in "trying murder cases
without being aware of" the law applicable to this issue.

 Co-counsel, in his affidavit, simply stated that he did not object to the improper argument by
Nilda's counsel because he "did not argue final summation." He stated the same at the evidentiary hearing,
explaining that he and lead counsel had "a general rule" that the attorney who does the witness/argument
makes the objections. He stated that he personally would have objected to the improper argument by
Nilda's counsel, but that he did not because it was "not [his] responsibility" since it was lead counsel's
"portion of the trial." (25)

 In short, the record shows that lead counsel: (1) did not know that an attorney cannot argue his
personal opinion about a witness's credibility; (2) did not research the issue; (3) failed to object to the
improper argument, because he did not know the legal basis for doing so. The record also shows that co-counsel: (1) was aware of the legal basis for objecting; (2) would have objected; but (3) did not object,
because of a general arrangement between the two attorneys that only the person doing the
witness/argument would make an objection. Thus, counsel failed in their "duty to bring to bear such skill
and knowledge as will render the trial a reliable adversarial testing process," Strickland, 466 U.S. at 688,
and we hold that their failure to object to the improper argument by Nilda's counsel constituted deficient
performance.

6. Counsel failed to request limiting instructions to the evidence of applicant's alleged extraneous
acts of misconduct. (26)

 The trial court had ruled that Gabriel's testimony about applicant's alleged extraneous acts of
misconduct became admissible when co-counsel opened the door to such evidence by asking Gabriel about
why Juan had not always been proud of applicant. Applicant argues, therefore, that this testimony was
admissible for the limited purpose of explaining why her father had not always been proud of her and not
as evidence of her credibility. Yet, Nilda's counsel used the testimony to argue that applicant was not
credible. (27) Applicant, therefore, argues that upon admission of that testimony, she was entitled to an
instruction, pursuant to Texas Rule of Evidence 105, that the jury should consider the testimony only for
the limited purpose for which it was offered and that her counsel's failure to request such instructions
constituted deficient performance.

 We agree that applicant was entitled to an instruction upon admission of the above testimony. See
Tex. R. Evid. 105 (a). See also Ex Parte Varelas, 45 S.W.3d 627 (Tex. Crim. App. 2001) (counsel
ineffective in failing to request instruction that extraneous offenses should be considered only for the limited
purpose for which they were admitted). In Varelas, the State had submitted evidence of several
extraneous acts allegedly committed by Varelas against the deceased victim for the purpose of showing
Varelas' state of mind, intent, motive and relationship to him. Id. at 630. We recognized that, if Varelas'
counsel had asked the trial court to instruct the jury to consider the extraneous-acts evidence only for the
limited purposes for which it was offered and only if they believed beyond a reasonable doubt that Varelas
had committed those extraneous acts, the trial court would have been required by law to give those two
instructions. Id. at 631. Thus, we held counsel's performance to be deficient in failing to request the
instructions. Id. at 632.

 In his affidavit, lead counsel admitted that: (1) he does not "read the Rules of Evidence quite often";
(2) he "always just refer[s] to the Pattern Jury Charge" as an authority for obtaining limiting instructions;
(3) applicant was entitled to an instruction, pursuant to Rules of Evidence 105 and 404(b), informing the
jury that it may consider the evidence only for the limited purpose for which it was offered and not as
substantive evidence of guilt; (4) neither he nor co-counsel requested such instructions, either when the
evidence was admitted or in the jury charge; but (5) he did not recall either discussing the issue with co-counsel or why they might not have requested those instructions. At the evidentiary hearing, however, he
insisted that co-counsel should have requested the instructions because the extraneous-acts evidence had
been admitted through a witness that he had questioned. (28)

 Co-counsel, in his affidavit, simply stated that he "was not responsible for the jury charge." At the
evidentiary hearing, he admitted that (1) applicant was entitled to a limiting instruction; (2) he could have
asked for it; and (3) if the judge had refused, applicant would have had an issue on appeal. However, he
stated that he did not want to ask for the instruction because he would have had to object before the jury,
which he was reluctant to do for fear of appearing as an "obstructionist" in front of them. (29) The record
shows that co-counsel did not know that an attorney could request a limiting instruction outside the
presence of the jury. (30) When habeas counsel pointed out that the trial court was required by law to give
those instructions upon the defense's request and that it would have done so even outside the presence of
the jury, again upon the defense's request, co-counsel responded, "I did not think it was that big an issue." 
When habeas counsel pointed out how Nilda's counsel then used the extraneous evidence to argue that
applicant was not credible and asked co-counsel why he did not request a limiting instruction at the jury-charge conference, which had been held outside the jury's presence, co-counsel responded, "That was
[lead counsel's] department."

 In short, the record shows that both lead counsel and co-counsel agreed that applicant was entitled
to the limiting instructions, but neither requested any because each seemed to consider that it was the other
counsel's responsibility to do so. We note that, in most cases, counsel's failure to request limiting
instructions might not constitute ineffective assistance. In the present case, however, it was tantamount to
ignoring the proverbial 800-pound gorilla in the room. Given the amount of extraneous-acts evidence that
existed, counsel should have asked for an instruction to at least try to limit the amount of what was
introduced after the trial court ruled that co-counsel had opened the door to such evidence. Counsel could
have asked for this instruction outside the presence of the jury, and thus avoided appearing as an
"obstructionist" in front of them. In the absence of such an instruction, Nilda's counsel in particular used
the evidence to try to damage applicant's credibility as much as possible before the jury and counsel
themselves admitted that applicant was harmed as a result of their failure to request a limiting instruction. 
We, therefore, hold that this failure constituted deficient performance.

Prejudice

 We note that while each of the above instances of error appears as a discrete incident, its
consequences permeated the entire trial. For example, when co-counsel opened the door to applicant's
extraneous acts of misconduct (allegation of error number 1), Nilda's counsel used the opening to introduce
as many specific instances of such conduct as possible during the State's case and in his defense, and
referred to them throughout his summation. (31) Similarly, when Nilda's counsel elicited from Gabriel, without
objection, specific instances of applicant's character (allegation of error number 4), he then used this
testimony to attack applicant's credibility throughout his summation, emphasizing that applicant's counsel
had also endorsed Gabriel's testimony. (32)

 Although co-counsel's opening the door to the extraneous evidence was itself quite harmful to
applicant's credibility, the damage could have been contained if counsel had requested an instruction
directing the jury to consider the evidence solely for the purpose for which it was admitted: to show that
Juan had not been proud of his daughter, and not as a challenge to applicant's credibility. We have
previously held that failure to request limiting instructions (allegation of error number 6) under circumstances
similar to those of this case constituted reversible error. See, e.g., Varelas, 45 S.W.3d at 636. In
Varelas, we noted particularly that the extraneous-acts evidence was central to the State's case and that
the State produced "little evidence" aside from this extraneous evidence to link Varelas to the victim's
death. Id. at 634. Similarly, in the present case, the State presented little evidence to connect applicant
to Juan's murder. The primary evidence against applicant was that she had taken the police to the site of
the suspected murder weapon's disposal. This raised two questions: how did she know where it was and
why did it take her so long to inform the police. She took the stand in part to answer these questions. 
Thus, her credibility was critical to her defense and was undermined by the extraneous-misconduct
evidence that Nilda's counsel introduced to portray her as a generally bad person. (33) In the absence of a
limiting instruction under such circumstances, we conclude that "'any prejudice resulting from introduction
of the extraneous offense is unabated.'" Id. (emphasis added) (quoting Abdnor v. State, 871 S.W.2d
726, 738 (Tex. Crim. App. 1994)).

 While repetition is the main problem in the above-mentioned errors, the nature of the error itself
cannot be ignored in the other three. As lead counsel agreed at the evidentiary hearing, evidence of
applicant's prior cocaine abuse was "harmful to her in front of the jury" (allegation of error number 2). In
fact, we have previously held that the introduction of prior drug use in a non-drug-offense case is reversible
error where there is "no suggestion or indication" that appellant committed the charged offense "to support
a drug habit." Couret, 792 S.W.2d at 108. Similarly, there is no evidence in the present case to indicate
that applicant's alleged murder of her father was somehow related to her drug habit, and we believe that
the harm was only increased by the fact that such evidence was presented to the jury by her own counsel.

 Again, lead counsel agreed that it was harmful to applicant for the jury to find out that she had
previously killed a living creature and apparently lied about it on the stand, and that the harm was
compounded by the argument by Nilda's counsel that applicant was violent and a liar (allegation of error
number 3). Similarly, co-counsel agreed at the evidentiary hearing that the prosecutor's impeachment of
applicant on the collateral matter of whether applicant had killed Nilda's rabbit was harmful to her when
her credibility had become an issue before the jury. In fact, we have previously held that the introduction
of such prejudicial evidence is reversible error even where the State can show some relevance of such
evidence to the case. See discussion of Templin, supra. As we discussed earlier, however, the evidence
was irrelevant in the present case.

 Finally, we address counsel's failure to object when Nilda's counsel argued his personal opinion
of applicant's credibility (allegation of error number 5). As noted previously, applicant's credibility was
critical to her defense. Under these circumstances, we have held that an attorney's argument relaying his
personal opinion about the credibility of the witness constitutes reversible error. See discussion of
Menefee, supra.

 In short, we conclude that, while each of the alleged errors standing alone might be insufficient to
prove ineffective assistance of counsel, taken together, under the cumulative-error standard, they
significantly prejudiced applicant's defense.

 Strickland supports our conclusion. As the Court advised us, "When a defendant challenges a
conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder
would have had a reasonable doubt respecting guilt." 466 U.S. 695.

 In making this determination, a court hearing an ineffectiveness claim must consider
the totality of the evidence before the judge or jury. Some of the factual findings will have
been unaffected by the errors, and factual findings that were affected will have been
affected in different ways. Some errors will have had a pervasive effect on the inferences
to be drawn from the evidence, altering the entire evidentiary picture, and some will have
had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported
by the record is more likely to have been affected by errors than one with overwhelming
record support. Taking the unaffected findings as a given, and taking due account of the
effect of the errors on the remaining findings, a court making the prejudice inquiry must ask
if the defendant has met the burden of showing that the decision reached would reasonably
likely have been different absent the errors.


Id. at 695-96 (emphasis added). Finally, the Court stated that "the ultimate focus of inquiry must be on
the fundamental fairness of the proceeding whose result is being challenged" and that "[i]n every case the
court should be concerned with whether, despite the strong presumption of reliability, the result of the
particular proceeding is unreliable because of a breakdown in the adversarial process that our system
counts on to produce just results." Id. at 696 (emphasis added).

 In closing, we note that while the jury had no difficulty reaching a decision in Nilda's case, it was
deadlocked with respect to applicant during both the guilt and the punishment phases. In fact, in the guilt
phase, the trial court had to give the jury an Allen charge in order to avoid a mistrial. Nevertheless, the
possibility of a mistrial seemed imminent in the punishment phase when one of the jurors approached the
trial judge, seeking to be excused. See 17 R.R. 90-95. She described how stressful it was for all the jurors
generally and for her personally (to the point of making her literally sick) to reach a decision in the case. 
Id. The trial judge did almost excuse her, but she agreed to continue when he told her that the case would
end in a mistrial if she were excused. Id. at 92-93. She expressed her hope that the jury would reach a
decision by the end of the day and stated that she "might be able to make it" by then, with the help of her
Pepto Bismol tablets, her blood-pressure medication and her insulin pills. Id. at 91-95. As it was, the jury
did reach a decision in Nilda's case the same day, but did not reach a decision in applicant's case until the
next day. In light of this record, we are all the more convinced that "there is a reasonable probability that,
but for counsel's unprofessional errors, the result of the proceeding would have been different," where a
"reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland,
466 U.S. at 694.

Conclusion

 In this case, applicant was tried, over objection, with her stepmother, Nilda. The State had no
witnesses or physical evidence to connect either defendant to the murder and, therefore, prosecuted the
two defendants on the basis of what each stood to gain from the victim's death. The record shows that the
State presented overwhelming evidence to show how Nilda benefitted, but it failed to produce any such
evidence against applicant. Rather, the State's primary evidence against applicant was that she had taken
the police to the site of the suspected murder weapon. Applicant took the stand to explain how she learned
of this location and why it took her so long to inform the police about it. But, as the record also shows,
Nilda was ably represented by aggressive counsel who took advantage of the joinder and the deficient
representation by applicant's counsel to attack applicant's credibility by introducing improper extraneous-acts evidence to portray her as a generally "bad person" and thus undercutting her attempts to rebut what
little evidence the State had produced against her. We hold that trial counsel's representation prejudiced
applicant's defense, grant relief from the judgment and remand applicant to the custody of the Sheriff of
Nueces County.


DELIVERED: OCTOBER 31, 2007

DO NOT PUBLISH
1. Applicant's and Nilda's statements differed only in the following respect. According to
applicant, when Nilda arrived at the Mall, she looked as if she had been crying and explained that: (1)
she and Juan had had an argument; (2) he had told her to leave the house; (3) she was afraid that he
would leave her; (4) he blamed her for all his problems; and (5) he feared he was going to lose his job
because of what had happened when Nilda, after she found out about his affair with another woman,
had hit her car against his Bronco when he and the other woman were still in it. According to Nilda's
statement, however, she and Juan resolved their problems whereby Juan promised never to see the
other woman and Nilda apologized for having "wrecked" his car, and the two of them then even made
love. Thus, Nilda's statement indicated that something else caused Juan's mood to change because,
when she returned after a quick shower, he just told her to leave the house, spend the night with her
parents, and be back at nine the next morning.
2. The police suspected that the murder weapon was a high-powered rifle of the kind owned by
Gabriel, Juan's son and applicant's brother. Gabriel was never a suspect in this murder investigation,
however, because he was serving in the Navy in Puerto Rico at the time of the murder. We will refer to
the rifle recovered by the bridge as the "suspected murder weapon," because police experts could not
positively identify it as the murder weapon due to its deteriorated condition after having been
underwater for several months.
3. Allen v. United States, 164 U.S. 492 (1896).
4. Both applicant and Nilda had filed a direct appeal. In a single unpublished opinion, the court
of appeals affirmed the trial court's judgments in both cases, but reformed the judgment as to applicant
to delete a deadly-weapon finding that the trial court had made in her case. Aguilar v. State, Nos. 13-97-339-CR & 13-97-348-CR (Tex. App.-- Corpus Christi, May 6, 1999). Both defendants filed a
petition for discretionary review with this Court. We refused applicant's petition, but granted that of
Nilda and vacated the judgment of the court of appeals in her case on the ground that her "requests for
severance made during trial were timely presented and should have been considered on the merits,
when, according to [Nilda], they were made after evidence was presented that was so prejudicial that a
severance was warranted." Aguilar v. State, 26 S.W.3d 901, 903, 910 (Tex. Crim. App. 2000). On
remand, the court of appeals again affirmed Nilda's conviction, concluding that the trial court had not
abused its discretion in denying her motions for severance. Aguilar v. State, 39 S.W.3d 700, 704
(Tex. App.-- Corpus Christi 2001, pet. ref'd).
5. The court which conducted the evidentiary hearing was not the same as the one that conducted
the original trial. Therefore, for the sake of clarity, we will refer to these courts as "the habeas court"
and "the trial court," respectively.
6. We note, however, that even in that discussion, there were at least two instances in which the
Court clearly indicated that the errors were supposed to be considered cumulatively. For instance, the
Court stated:


 A convicted defendant making a claim of ineffective assistance must identify the acts or
omissions of counsel that are alleged not to have been the result of reasonable
professional judgment. The court must then determine whether, in light of all the
circumstances, the identified acts or omissions were outside the wide range of
professionally competent assistance. 


Strickland, 466 U.S. at 690 (emphasis added). Again, the Court noted that "any deficiencies in
counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance
under the Constitution." Id. at 692 (emphasis added).
7. For example, the Court stated, "Even if a defendant shows that particular errors of counsel
were unreasonable . . . the defendant must show that they actually had an adverse effect on the
defense," 466 U.S. at 693 (emphasis added); "[t]he result of a proceeding can be rendered unreliable,
and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a
preponderance of the evidence to have determined the outcome," id. at 694 (emphasis added); "[t]he
defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors,
the result of the proceeding would have been different," id. (emphasis added); "[w]hen a defendant
challenges a conviction, the question is whether there is a reasonable probability that, absent the errors,
the factfinder would have had a reasonable doubt respecting guilt," id. at 695 (emphasis added); and
"[t]aking the unaffected findings as a given, and taking due account of the effect of the errors on the
remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of
showing that the decision reached would reasonably likely have been different absent the errors," id. at
696 (emphasis added).
8. "The State could find no contrary authority, nor does it believe that it can make a good faith
argument that deficiencies should not be assessed collectively or cumulatively in determining whether the
Applicant was prejudiced by trial counsel's errors or deficient performance." State's Brief at 4-5. 
"Accordingly, the State concedes that prejudice is measured by considering the cumulative effect of all
of the errors made by trial counsel." Id. at 5.
9. For instance, neither Nilda's nor applicant's fingerprints were found either on the fired casing
or the ammunition for the rifle, the suspected murder weapon; and it was impossible to obtain any
fingerprints from the rifle that was recovered from the creek, due to its deteriorated condition from
having been underwater for several months.
10. Specifically, the evidence showed that Juan was having an affair with another woman and
wanted to leave Nilda; that Nilda found out about it; that she angrily confronted Juan, his mistress, and
even the mistress's husband about the affair; that she twice asked Juan's sister-in-law (his brother's
wife) to find someone to kill Juan's mistress; that she offered to pay the killer $10,000 for this service;
and that, only about six weeks before Juan was killed, she herself tried to seriously hurt Juan and his
mistress by repeatedly ramming her car against Juan's Bronco, while he and the mistress were in it. In
addition, the State introduced testimony that Nilda stood to gain $100,000 as the main beneficiary in
Juan's life insurance policy and over $70,000 as the sole beneficiary of Juan's retirement fund, a total of
approximately $175,000 from Juan's death. Applicant would receive nothing from these proceeds and
benefits.
11. The trial court had appointed counsel for applicant and, later, this counsel recruited the
assistance of another counsel. For the sake of clarification, we shall refer to these attorneys as "lead
counsel
" and "co-counsel," respectively.
12. See, e.g., RR 10 at 43 ("I don't think that either one of the codefendants has any authority at
all to go into extraneous offenses of the other codefendant. So if that's what your intent is, I don't think
it's proper.") See also id. at 48-49:


 I think what [Nilda's counsel] is attempting to do is go into extraneous offenses. And I
don't think it is proper. And I am telling [counsel for both defendants] that if that's the way
you are going to attempt to try to - - is to show that your - - the codefendant is a bad
person, that she yells at people and kicks little puppies and attacks women or anybody
else or children, I am not going to let you do that.
13. The habeas court relied heavily on co-counsel's affidavit and testimony in making its findings. 
But it should be noted that co-counsel admitted at the evidentiary hearing that: (1) he declined to make
an affidavit, at the request of applicant's habeas counsel; (2) he declined to discuss matters related to
the habeas proceeding, upon lead counsel's invitation to join him at a meeting with the habeas counsel;
(3) he applied for a job with the Nueces County District Attorney's office on November 10, 2005; (4)
he was hired on December 5, 2005; and (5) as a new prosecutor, he "help [ed the habeas prosecutor]
prepare" his affidavit for the evidentiary hearing in this case. When the habeas counsel asked, "Who
wrote your affidavit?" co-counsel stated that "it was probably done on [habeas prosecutor's] word
processor." He then added that he himself "probably drafted most of it." He then added again that "I
may have drafted about half of it and corrected parts that he did that I did not think were accurate." 
The State then filed that affidavit on December 14, 2005, two days after the filing of the present habeas
application.
14. See, e.g., RR 10 at 207:


 [T]hat is the State's position in this case, and what we expect the evidence to show
that [Nilda] put [applicant] up to killing her father, that [Nilda] was capable of doing it,
[Nilda] had the money to do it, and in fact, made this offer [to Juan's brother's wife],
according to the [the testimony of Juan's brother's wife], not only once when [Nilda]
asked if anybody over in Robstown, I believe it was, would kill that bitch [Juan's mistress].

 

 And then three or four days later, [Nilda] called [Juan's brother's wife] again and
asked her if she found anyone. I think it's relevant to [Nilda's] state of mind. I think it's
relevant that [Nilda] is trying to get somebody else to do it. I think it's relevant as to
[Nilda's] feelings about her marriage with Juan, that it was headed towards a dead end. 
There has been some attempts at cross-examination of State's witnesses . . . to show that
everything was just fine and wonderful between the two [Juan and Nilda] when, in fact, it
was not. [Nilda] was trying to have somebody killed she was so concerned about her
relationship with Juan.


 The State articulated its theory outside the presence of the jury, but it did so on the record and
in front of all the parties. Thus, the record shows that there was no reason for co-counsel to expect that
the State would bring up evidence of applicant's extraneous acts of misconduct under any theory
related to the allegation that Juan was not proud of his daughter.
15. Nilda's counsel admitted in his affidavit that he was "surprised" that co-counsel asked that
question, and that he "immediately took advantage of the opportunity to elicit from Gabriel as much
harmful testimony as possible regarding" applicant.
16. See note 14, supra.
17. The prosecution must show (1) that the offense or transaction is relevant to a material issue in
the case and (2) that the probative value of the evidence to the trier of fact is not substantially
outweighed by its prejudicial or inflammatory nature. Templin, 711 S.W.2d at 33. See also Tex. R.
Evid. 403 ("Although relevant, evidence may be excluded if its probative value is substantially
outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by
considerations of undue delay, or needless presentation of cumulative evidence.").
18. Nilda's counsel stated in his affidavit: when "the prosecutor elicited without objection that
[applicant] killed Nilda's rabbit," he "considered this testimony to be very prejudicial to [applicant],
and, because she was caught in a lie about whether she had killed the rabbit, [he] argued during
summation that it demonstrated that she was not only violent but also dishonest."
19. Counsel said nothing before or after this comment to indicate why he made it.
20. See, e.g., "It's interesting to me . . . that [applicant's] own lawyer admit[s] she is a liar";
"Well, yes, [applicant], the lying [applicant], confessed liar, lawyer says she is a liar, says, mama gave
me the gun."
21. Even though Gabriel was applicant's brother, he had testified for the State. In fact, Nilda's
counsel treated Gabriel as his own witness, testifying in favor of his stepmother, Nilda, rather than his
sister, applicant. Thus, there is nothing in the record to indicate that Gabriel was "a hostile witness, an
adverse party, or a witness identified with an adverse party" that would have justified the leading
questions by Nilda's counsel under Tex. R. Evid. 611(c).
22. "I decided it was so obvious that she was a liar, so obvious that she was a liar that [the jury]
didn't need any more help" in seeing that she was. (Emphasis added.) "[N]o effort here is made to
help [applicant], because I think she is a liar . . . [Y]ou cannot rely on what she says." (Emphasis
added.) In his affidavit, Nilda's counsel admitted: "During summation, I argued without objection my
personal belief that [applicant] was a liar."
23. The prosecutor had argued, "And Virse, I don't believe I have ever seen anybody that I
thought was any more honest than she is." Menefee, 614 S.W.2d at 168.
24. See, e.g., R.R., Vols. 7 & 8 (showing the trial court's and the attorneys' attempts, at voir
dire, to ascertain whether members of the jury pool knew Nilda's counsel personally or from his
appearances on television and, if so, whether this knowledge might affect their jury functions). See also
R.R., Vols. 1-18 (side bar conferences, before and throughout the trial, containing the trial court's and
the State's remarks about Nilda's counsel's vigorous performance).
25. See, e.g., the following exchange, at the evidentiary hearing, between habeas counsel and co-counsel:


 Q. So you were sitting there listening to an argument that you knew was clearly
improper. Did you ever think about giving [lead counsel] the ol' elbow to get up and
object?

 

 A. I thought about that and didn't.

 

 Q. Better to let [applicant] go down with the ship than to tell the lawyer to object to an
argument that was manifestly improper?

 

 A. No. Better not to distract him from what he was concentrating on.


 Q. And what was he concentrating on?

 

 A. I think he was making notes to stand up and hopefully rebut [Nilda's counsel].

 

 Q. Certainly you are aware of the case law that a lawyer cannot argue his personal
opinion of a witness' credibility, correct?

 

 A. I think I probably would have made that argument.


 We note that the record shows the following order in which the parties closed: the State,
applicant's counsel, Nilda's counsel, and then the State again. Thus, lead counsel never gave a
"rebuttal" as co-counsel suggested in the above excerpt.
26. The State asserts laches as a defense (to applicant's sixth allegation, in its December 15,
2005 response and to the entire application in its brief), contesting applicant's "delay in filing the present
application for writ of habeas corpus (December 12, 2005), some eight and a half years after trial and
sentencing (June 19, 1997), and almost six years after her conviction became final and mandate issued
on her appeal (January 19, 2000)." The relevant date is not the date of judgment but the date that the
conviction became final on appeal. Tex. Code Crim. Proc. art.11.07 § 3(a). This Court has no
jurisdiction to hear habeas claims before the court of appeals issues mandate on a direct appeal. Ex
parte Johnson, 12 S.W.3d 472, 473 (Tex. Crim. App. 2000). Mandate on applicant's direct appeal
issued on January 19, 2000. Moreover, this Court has "never denied relief on a valid claim due to an
applicant's delay in bringing the claim." Ex Parte Carrio, 992 S.W.2d 486, 487 (Tex. Crim. App.
1999). The doctrine of laches "concerns prejudice, not mere passage of time," id. at 488 n.3, and "the
length of delay alone will not constitute either unreasonableness of delay or prejudice." Id. at 488. In
the present case, the State has failed to show prejudice because the record shows a remarkable
precision in counsel's responses (in their affidavits and their testimony at the evidentiary hearing) to the
allegations against them. The doctrine of laches is, therefore, not applicable to this case.
27. For example, Nilda's counsel states in his affidavit: "I elicited before the jury the prior acts of
extraneous misconduct that contributed to why Juan was not proud of [applicant] - including that she
talked back to him in front of others, had children out of wedlock, was a topless dancer, and associated
with unsavory persons. My goal was to make her look disreputable and dishonest, and, in my opinion,
I succeeded." He noted: "Thereafter, I argued during summation that [applicant]'s extraneous
misconduct demonstrated that she was incredible. Of course, a limiting instruction would have
precluded this improper argument."
28. See, e.g., the following interaction between habeas counsel and lead counsel:


 Q. In other words, you don't wait until the jury charge to get a limiting instruction. You
ask for it at the time the evidence is admitted, right?

 

 A. Well, depends on what the evidence is. Again, that's [co-counsel's] witness.

 

 Q. So it was his responsibility to request a limiting instruction?

 

 A. His witness.


See also the following interaction between habeas counsel and lead counsel:


 Q. [Y]ou would agree with me that it is pretty easy to tap him on the shoulder and say,
why don't you ask the witness this question, correct?

 

 A. Right. Except for the way we were set up.

 

 Q. Or you could lean over and tell [co-counsel], request a limiting instruction. It would
have been easy to do that?

 

 A. I could have done that.

 

 Q. But you didn't, did you, sir?

 

 A. That did not happen.
29. In fact, counsel have generally tried to explain all their alleged failures to object by stating that
it was their trial strategy not to object in order to avoid appearing as an "obstructionist" in front of the
jury. Ordinarily, this might be a good reason not to object. It is inapplicable in the present case,
however, where the record shows the following. First, both the trial judge and the State had explained
to the jury, at the beginning of the trial, that they: (1) were supposed to decide on the facts, but that it
was the judge's duty to determine the legal admissibility of what is presented to them; (2) should expect
the attorneys to object; and (3) should not hold such objections against the attorney but realize that it
was for the legitimate purpose of determining a legal question and not because the attorney was "trying
to hide something" from them. Second, the record also shows that both the State and Nilda's counsel
made numerous objections during trial, but that the aforementioned objection relating to the opening-of-the-door issue appears to be the only time that applicant's counsel objected. Third, the record shows
that the trial judge had set up a system whereby he removed the jury from the courtroom to hear each
objection. At the end of each discussion, however, he would give the other parties a chance to discuss
anything else that might require his attention in order to reduce the number of interruptions during trial. 
Thus, applicant's counsel could have taken advantage of such opportunities to make their objections,
outside the presence of the jury, but they never did.
30. See, e.g., the following interaction between habeas counsel and co-counsel:


 Q. And to ask for a limiting instruction, you don't have to do it again in front of the
jury, do you?

 

 A. Yes, you do, or you waive the error.
31. See, e.g., note 15, supra.
32. See, e.g., note 20, supra.
33. See, e.g., affidavit by Nilda's counsel: "I elicited before the jury the prior acts of extraneous
misconduct that contributed to why Juan was not proud of [applicant] - including that she talked back
to him in front of others, had children out of wedlock, was a topless dancer, and associated with
unsavory persons. My goal was to make her look disreputable and dishonest, and, in my opinion, I
succeeded." He noted: "Thereafter, I argued during summation that [applicant]'s extraneous
misconduct demonstrated that she was incredible. Of course, a limiting instruction would have
precluded this improper argument."